# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF WASHINGTON

—— ENTERED
—— LODGED
—— RECEIVED

**JUN 13 2003**

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

In the Matter of the Search of
The business of
PW Arms, Inc. located at
8525 152nd Street
Redmond, Washington

## APPLICATION AND AFFIDAVIT
## FOR SEARCH WARRANT

CASE NUMBER: **03-336M①**

I, <u>MICHAEL B STEWART</u> being duly sworn depose and say

I am a <u>Special Agent, ATF</u> and have reason to believe that ___ on the person of or <u>XX</u> on the premises known as (name, description and/or address)

The business known as PW Arms, Inc as further described as a multi-business building with metal siding that is tan in color with approximately the last three feet from the top being an off-white color  There is a black awning with large white letters approximately ten inches in height that spell J E WORK, INC , located above a black walk-in door  The black walk-in door with white numbers 8525 on it  There is a window to the left of the black walk-in door and there is a small dark in color with white lettering sign that says J E Work, Inc , in the top right corner of the window  Located in the lower left corner of the window is a small white sign with red lettering that says "Don't even think of parking here "  To the left of the black walk-in door is a large overhead garage door that is off-white in color and it is the second garage door in from the north  To the left of the garage door is a green garbage dumpster

in the <u>Western</u> District of <u>Washington</u> there is now concealed a certain person or property, namely (describe person/property)

IMBEL FN FAL type machinegun parts kits and documentary evidence of the importation, storage and distribution of those parts kits (including documents relating to Case No  C02-1026L)

which is (give alleged grounds for search under Rule 41(b) Fed R Crim P )

Evidence of the crimes of illegal smuggling, importation and possession of machineguns

in violation of Title <u>18</u> United States Code, Sections <u>542, 545, 922(e), 922(o)(1)</u> and Title <u>26</u> United States Code, Section <u>5861(d)</u>
The facts to support the issuance of a Search Warrant are as follows

See attached Affidavit of Special Agent MICHAEL B STEWART, attached hereto and incorporated herein.

Continued on the attached sheet and made a part hereof  <u>XX</u> Yes  ___ No

M 03-00336  #00000001

Michael B Stewart
MICHAEL B STEWART, Special Agent
Signature of Affiant

Sworn to before me, and subscribed in my presence

<u>June 13, 2003</u>  at
Date and Time Issued

<u>Seattle, Washington</u>
City and State

<u>MARY ALICE THEILER, U S Magistrate Judge</u>
Name & Title of Judicial Officer

Signature of Judicial Officer

1

AFFIDAVIT

2  STATE OF WASHINGTON )
                        )   ss
3  COUNTY OF KING       )

4

5       I, Michael B. Stewart, being duly sworn, do hereby depose and state:

6  **BACKGROUND**

7       1       I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and
8  Explosives, United States Department of Justice (ATF), and have been so employed by ATF
9  and its predecessor agency since July 30, 1989  I am a graduate of Washington State
10  University  I am also a graduate of the Federal Law Enforcement Training Center's Criminal
11  Investigation School and ATF's New Agent Training program  The following is based on my
12  personal observations and upon information provided to me by other law enforcement agents
13  This affidavit is submitted in support a warrant to search the premises of P.W. Arms, Inc.
14  (P.W  Arms), 8525 152nd Street, Redmond, Washington  98052, as well as associated storage
15  facilities located at 8533 152nd Street, Redmond, Washington  98052, further described in
16  Attachment A, for evidence of violations of Federal firearms laws

17       2       In summary, an investigation has revealed that P W  Arms has illegally imported
18  and distributed machineguns as defined in Federal law. Specifically, P W  Arms, imported
19  what it purported to be 16,000 deactivated machineguns, which were in fact, not deactivated in
20  a manner that removed them from the definition of "machinegun," in that they could be readily
21  restored to shoot automatically more than one shot, without manual reloading, by a single
22  function of the trigger. Evidence of that crime is believed to be at the business and storage
23  premises of P.W. Arms  Said evidence includes almost 6,000 machineguns and business
24  records and other records, further described in Attachment B, relating to the importation,
25  storage and distribution of these items

26  **RELEVANT LAW**

27       3       26 U.S.C. § 5845(b) defines the term "machinegun" to mean "any weapon which
              shoots, is designed to shoot, or can be readily restored to shoot, automatically
28            more than one shot, without manual reloading, by a single function of the trigger
              The term shall also include the frame or receiver of any such weapon, any part

designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."

4     18 U.S.C. § 922(l), 18 U.S.C. § 925(d), and 26 U.S.C § 5844 generally prohibit the importation of machineguns into the United States. It is not illegal to import a machinegun that has been deactivated or destroyed in such a manner that it no longer has the design characteristics of a machinegun or cannot be readily restored to shoot

5.    18 U.S.C. §§ 542 and 545 make it unlawful to import goods into the United States by fraud or false statements, or to import any merchandise contrary to law.

6     18 U.S.C. § 922(o)(1) and 26 U.S C. § 5861(d) generally make it unlawful for any person to transfer or possess a machinegun.

## STATEMENT OF FACTS

A   IMPORTATION OF IMBEL FN FAL TYPE PARTS KITS BY P.W. ARMS

7     According to Stacy N. Prineas, President of P W. Arms, a Federal firearms licensee located at 8525 152nd Street, Redmond, Washington, he entered into negotiations with Patricio Salinero Arrigorriaga (Salinero), a Chilean arms broker, in early 2000 to buy a quantity of "parts kits" to be assembled from destroyed Brazilian-made IMBEL FN FAL type machineguns

8.    In an ATF Form 6, Application and Permit for Importation of Firearms, Ammunition and Implements of War (hereinafter ATF Form 6) dated May 8, 2000, acting on behalf of P W. Arms, Daniel Tobin, 400 5th Street, New Kensington, Pennsylvania 15068, a Federal firearms licensee operating as "Dan's Sporting Goods, Inc.," sought to import, among other things 25,000 "FAL rifle parts kits " ATF approved said permit on May 15, 2000, and assigned it permit number 00-05532. The permit indicated that the parts kits were being sold, and were to be shipped, by Salinero. Said permit remained valid for a period of one year.

9     Prineas has confirmed that he sent Tobin, acting on behalf of P.W Arms, to Chile in July 2000, to inspect the FAL rifles that Salinero was offering for sale.

10    I have examined a copy of a contract Tobin signed on behalf of PW Arms, on July 7, 2000, in the name of Dan's Sporting Goods, Inc , whereby Salinero agreed to deliver 24,582 IMBEL FN FAL type parts kits at a cost of $84 each. The contract specified that the

AFFIDAVIT OF MICHAEL B STEWART - 2

1   Form 6 obtained by Dan's Sporting Goods would be used to effect the importation of the parts
2   kits.  The contract included a handwritten diagram depicting a receiver of an FN FAL type
3   machinegun.  Included on this diagram are handwritten cutting instructions, approved by
4   Tobin, calling for the receiver of the firearm to be cut into three pieces   The instructions on
5   this diagram specify that the "mid portion to be kept intact with locking shoulder, ejector block
6   and other parts."  This diagram has been examined by Curtis H A  Bartlett, an ATF firearms
7   technology expert.  Bartlett reports that an FN FAL machinegun cut in the manner depicted in
8   the drawing would not deactivate the firearm in a manner that it could be lawfully imported into
9   the United States. The contract specified that the parts kits were to be forwarded in three
10  shipments.

11          11      Later on July 7, 2000, on behalf of P.W  Arms, Prineas signed an almost
12  identical contract with Salinero.  The contract substituted Prineas for Tobin and the name PW
13  Arms for Dan's Sporting Goods, Inc   According to Prineas, the purpose of this contract was to
14  clarify that the contract was between Salinero and P W  Arms, and not Dan's Sporting Goods.

15          12      On May 18, 2001, prompted by a contract dispute, Salinero filed suit against
16  P.W. Arms and Dan's Sporting Goods in the United States District Court for the Western
17  District of Pennsylvania.  That case was eventually transferred to the United States District
18  Court for the Western District of Washington and captioned <u>Patricio Salinero Arrigorriaga v.</u>
19  <u>P.W  Arm's Inc , Dan's Sporting Goods</u>, Case No  C02-1026L   The lawsuit eventually settled
20  and an Order of Dismissal was entered on May 15, 2003.

21          13      In an Answer dated July 12, 2002 (filed July 15, 2002) to Paragraph 14 of the
22  Complaint filed in Case No  C02-1026L, P.W. Arms and Dan's Sporting Goods, Inc., admitted
23  that "they had approved the method of deactivating [the FAL type machinegun parts kits]
24  receivers

25          14      In a deposition taken on January 14, 2003, Prineas stated that the first shipment
26  of approximately 6,000 FAL type parts kits arrived in Houston, Texas, in August 2000.

27

28

AFFIDAVIT OF MICHAEL B  STEWART  - 3

1    15    In a Declaration dated March 4, 2003, Prineas stated that this shipment of 6,000
2  FAL type parts kits was not released from Customs until September 2000  Prineas further
3  stated that it was the intention of P W Arms to have Larry Horner, a gunsmith in Texas,
4  assemble IMBEL FN FAL rifles using the parts kits and imported receivers.

5    16.    Prineas further testified in his January 14, 2003, deposition that a second
6  shipment of approximately 10,000 IMBEL FN FAL type parts kits arrived in Seattle,
7  Washington, and was released from U.S. Customs to P W Arms on or about November 2,
8  2000.

9    17    Following receipt of those shipments, P.W. Arms and Salinero had a falling out
10  over the quality and method of shipment of the firearms.  As a result, P.W Arms refused to
11  accept shipment of the remaining 8,579 firearms. This dispute was the basis for the Complaint
12  filed in Case No  C02-1026L

13    18    Prineas testified in his January 14, 2003, deposition that P.W Arms was still in
14  possession of between 10,000 and 12,000 of the FN FAL parts kits; that roughly 8,800 of the
15  parts kits were being stored in a warehouse in Redmond, Washington, and that the remaining
16  kits were being stored in a warehouse in Apollo, Pennsylvania.

17    19    During the January 30, 2003, deposition of Doug Work, Vice President of PW
18  Arms, counsel for P W. Arms presented a written summary/spread sheet by P.W Arms of its
19  rifles and parts kits sales, drawn from invoices, that indicates that as of January 27, 2003,
20  P W. Arms had a total inventory of 11,171 FN FAL type parts kits, of which 8,415 were in
21  inventory in Redmond, Washington, while 2,756 were in inventory in Apollo, Pennsylvania
22  The spread sheet also indicates that P W. Arms sold/ delivered 2,288 FN FAL parts kits to
23  Dan's Sporting Goods, Inc , between February 20, 2001, and November 15, 2002.

24    20.    Dick Van Loan, Director, Industry Operations (hereinafter "DIO"), Seattle Field
25  Division, ATF, has informed me that during a telephone conversation with Doug Work, Vice
26  President of P W. Arms, on May 30, 2003, Work stated that P.W. Arms contracted to
27  purchase approximately 24,000 IMBEL FN FAL type machinegun parts kits from a Chilean
28  company.  Work further stated that after taking possession of 16,000 of these kits, a dispute

AFFIDAVIT OF MICHAEL B STEWART - 4

1 arose regarding the remaining 8,000 kits and according to Work, Interordnance of America,
2 L.P , entered into a contract to purchase the rest of the lot.

3     21.    During that same conversation, Work told Van Loan that in February 2003, he
4 had shown a sample of an FN FAL parts kit to an ATF official (believed to be Curtis H.A.
5 Bartlett, ATF's then Chief of the Firearms Technology Branch), at the Shot (Shooting Hunting
6 Outdoors Trade) Show in Orlando, Florida, and that the ATF representative indicated that the
7 parts kits were legal. Work claimed that what he showed ATF at the Shot Show is exactly
8 what PW Arms is selling.

9     22    On June 12, 2003, I monitored a telephone conversation between Work and ATF
10 Group Supervisor Doug Krogh Work stated that P W .Arms originally possessed 16,000
11 IMBEL FN FAL type machinegun parts kits, but had only 6,000 presently in its possession.
12 Work further stated that P.W Arms has possessed the kits since sometime in 2000. Work
13 acknowledged the problems that Interordnance of America was having concerning IMBEL FN
14 FAL parts kit and stated that "all the kits here are from the same batch" as the unlawfully
15 imported kits seized from Interordnance. Work told Agent Krogh that the parts kits possessed
16 by P W. Arms had been cut into three pieces and that one piece had been left behind in Chile
17 Work told Agent Krogh that P.W.Arms did not want any trouble and would agree to an
18 inspection of the kits by ATF. Work said "if you have any concerns, come out and take a look
19 at them." Work added that PW Arms settled its lawsuit with Salinero and that he had a
20 deadline of June 20, 2003, to transfer the remaining parts kits back to Salinero. Work
21 indicated that he believed Salinero successfully sold the remaining parts kits to an unidentified
22 customer within the United States. When asked where the parts kits were currently located,
23 Work stated that they were being stored in a warehouse located at 8533 152nd Street,
24 Redmond, Washington.

25     23    Simultaneously to this telephone contact, ATF was conducting surveillance at
26 P.W Arms. One of the agents conducting surveillance advised me that he observed a large
27 number of wooden crates having steel bands and numbers on them, within the warehouse
28 located at 8533 152nd Street, Redmond, Washington.

B. ATF/CUSTOMS INVESTIGATION OF INTERORDNANCE OF AMERICA

24    On December 4-5, 2001, a Federal search warrant was executed at the business premises of Interordnance of America, L P , located in Monroe, North Carolina   Pursuant to the search warrant, a number of items, including 2,637 IMBEL FN FAL type parts kits that were purchased by Interordnance from Salinero.  A sample of one of the seized IMBEL FN FAL parts kits was submitted to ATF's Firearms Technology Branch in Washington, D C., for technical examination and classification.

25.    According to ATF Firearms Enforcement Officer Al Houde, who examined that sample taken from Interordnance, the firearm was originally designed and manufactured as a shoulder fire, closed bolt, magazine fed, gas operated, selective fire machinegun   Houde concluded that the aforementioned sample is a "machinegun" as defined in 26 U.S.C. § 5845(b)   In other words, the way in which the machinegun was cut did not deactivate it in a manner that would no longer be considered a machinegun under Federal law.

26    Subsequent physical examination of the entire IMBEL FN FAL shipment to Interordnance revealed that all of the machineguns were cut in the same manner.  Curtis H A Bartlett, an ATF Firearms Technology expert, has determined that these machineguns are cut in the manner depicted on the schematic included in the contract that Prineas entered into with Salinero

C. CONTACTS WITH OTHER FEDERAL FIREARMS LICENSEES

27    On or about May 22, 2003, ATF Special Agent Ricky A. Hankins and ATF Group Supervisor Terry L. Hicks, of ATF's St Paul, Minnesota, Field Office, while working on an unrelated investigation, contacted The Sportsman's Guide, Inc. (hereinafter "Sportsman's Guide"), South St  Paul, Minnesota   At that time, Thomas Glowaski, Assistant Treasurer of Sportsman's Guide, revealed that his company had recently received 45 FN FAL parts kits from PW Arms.  Due to Group Supervisor Hicks' observation that the kits that Sportsman's Guide received from PW Arms apparently were cut in the same manner as those ATF seized

1    from Interordnance, Group Supervisor Hicks caused a digital photograph of one of the FN FAL

2    parts kits to be taken and sent to ATF's Firearms Technology Branch

3        28     On May 29, 2003, Agent Hankins and Group Supervisor Hicks met with Greg

4    Gerling, a purchasing agent for Sportsman's Guide   Gerling said that in February 2003, he

5    was approached by Prineas at the Shot Show in Orlando, Florida. Gerling stated that at the

6    time, Prineas solicited him to purchase firearm parts kits from PW Arms and touted P W. Arms

7    as having the only "totally legal" FN FAL parts kits available in the United States.

8        29     Gerling provided the agents with an invoice dated May 1, 2003, from P W. Arms

9    (Invoice No  PW-6001-23) for the sale of 45 "IMBEL FAL part kits" to Sportsman's Guide at a

10   unit price of $125 each. Gerling informed Agent Hicks that the shipment of parts kits arrived

11   on May 15, 2003. At the conclusion of the interview, Agent Hicks seized one of the IMBEL FN

12   FAL parts kits and forwarded it to ATF's Firearms Technology Branch for a technical

13   examination

14       30     That kit was received by ATF's Firearms Technology Branch on June 2, 2003

15   Firearms Enforcement Officer Houde confirmed that this FN FAL parts kit, which Sportsman's

16   Guide obtained from P W  Arms, was cut in an identical manner to the FN FAL parts kits

17   seized from Interordnance in December 2001, that ATF classified as a "machinegun " On

18   June 2, 2003, Curtis H.A. Bartlett stated that he examined the above-referenced FN FAL parts

19   kit seized from Sportsman's Guide and that it differed from the sample Work showed him at

20   the February 2003 Shot Show in that the FN FAL parts kits from P.W. Arms shown to him in

21   Florida had only the front portion of the cut receiver, which was attached at the barrel.  By

22   contrast, the FN FAL parts kits sample seized from Sportsman's Guide included the front and

23   middle portions of the receiver and was determined to be cut in the same manner as the

24   unlawfully imported FN FAL parts kits seized from Interordnance. Thus, it is fair to infer that

25   the remaining kits at P W. Arms are also machineguns imported and possessed unlawfully.

26       31.     Rod McKay, Federal Arms Corporation, Fridley, Minnesota, has told ATF that in

27   April 2003, Prineas contacted him and offered to sell him 6,000 FN FAL type machinegun

28

1  parts kits   McKay declined the offer when Prineas refused to provide adequate assurances
2  that the kits were legal.  Prineas' refusal suggests that he knows the pars kits are illegal

3      32.    On June 4, 2003, ATF Special Agents John Schroepfer and Nathaniel Jones
4  interviewed Scott Corrigan, Import Manager, Century International Arms Corporation
5  (hereinafter "Century Arms"), 236 Bryce Boulevard, Fairfax, Vermont.  Corrigan said that on or
6  about May 15, 2003, he was told by Brian Sucher, CEO of Century Arms, that Prineas had
7  contacted Century Arms headquarters, 1161 Holland Drive, Boca Raton, Florida, and stated
8  that he had 6,000 IMBEL FAL "parts kits" from Chile for sale   On May 16, 2003, Century Arms
9  faxed a letter to Prineas asking for an offer on the kits as well as confirmation that the kits
10 were complete.  Prineas followed up this conversation with a letter to Century Arms dated May
11 17, 2003, offering to sell IMBEL FAL parts kits.  On May 24, 2003, Prineas offered to sell the
12 parts kits at a cost of $125 each   Corrigan told Agents Schroepfer and Jones that he
13 personally believed that the items Prineas was attempting to sell were unlawfully imported and
14 that Century ultimately decided not to consummate the transaction

15     33     Corrigan added that on November 23, 2001, Century Arms purchased 4,563
16 IMBEL FN FAL machinegun parts kits from Salinero   Corrigan stated that prior to importing
17 these items, Century Arms recognized the items as machineguns.  It then legally imported
18 them as such, and completed the deactivation process under U.S. Customs Service
19 supervision   Corrigan stated that these machinegun parts kits were only a portion of a larger
20 lot that Salinero had offered for sale and that Corrigan was aware that three other companies
21 in the United States were involved in purchasing other parts kits from this lot   Corrigan
22 identified the other parties as P.W Arms, Dan's Sporting Goods, and Interordnance

23     34     Significantly, Corrigan further informed Agents Schroepfer and Jones that on or
24 about August 2002, he caused a Century Arms employee to order an IMBEL FAL parts kit
25 from Dan's Sporting Goods.  Corrigan stated that his reason for having the purchase made
26 was to determine whether Century Arms would be interested in making a bulk purchase order
27 from Dan's Sporting Goods since, according to Corrigan, Century Arms was beginning to run
28 short on FN FAL parts

AFFIDAVIT OF MICHAEL B STEWART - 8

1      35.    Corrigan told Agents Schroepfer and Jones that he conducted an inspection of
2  the IMBEL FAL parts kit when it arrived from Dan's Sporting Goods  Corrigan said that he
3  immediately recognized that the parts kit was a "machinegun" because in his opinion, the
4  firearm had not been properly deactivated.  Corrigan further stated that after examining the
5  parts kit purchased from Dan's Sporting Goods, he realized that the parts kit had been cut in
6  the same locations and manner as the ones that Century Arms purchased from Salinero in
7  November 2001

8      36    Corrigan added that because of his suspicion that the parts kit obtained from
9  Dan's Sporting Goods was actually a "machinegun," he forwarded the parts kit to ATF's
10  Firearms Technology Branch for a technical examination   In a letter to Corrigan, the Firearms
11  Technology Branch determined that the parts kit was, in fact, a machinegun.  ATF's Firearms
12  Technology Branch advises that the parts kit submitted by Corrigan was cut in the same
13  manner as the schematic attached to the contract P.W. Arms entered into with Salinero, again
14  supporting the inference that the parts kits at P.W. Arms are illegal

15  D.  ADDITIONAL INFORMATION

16      37.    P.W  Arms, as a Federal firearms licensee operating under license number 9-91-
17  033-08-3G-38718, is required to keep and maintain records on its business premises relating
18  to the acquisition and disposition of firearms.  See 18 U S.C. § 923(g) and 27 C.F R  §
19  478.121 (formerly 27 C F R. § 178.121).

20      38.    27 C F R  § 447.34 (b) (formerly 27 C.F.R. § 47.34(b)) states that registrants
21  under this part engaged in importing articles on the U S  Munitions List subject to the permit
22  procedures of subpart E of this part shall maintain for a period of six years, subject to
23  inspection by any ATF Officer, records bearing on such articles imported, including records
24  concerning their acquisition and disposition by the registrant

25      39.    A query of the ATF Federal Firearms Licensee Database reflects the listed
26  address for P.W Arms to be 8525 152nd Avenue, Redmond, Washington  98052  ATF's
27  *records show that PW Arms has held a Federal firearms license since at least June 1997 and*
28  *has been at its current location since that time*

1      40.    P.W. Arms, as an importer of record with the United States Customs Service

2 operating under consignee number 91-177108500, is required to keep and maintain required

3 records relating to the importation of merchandise into the commerce of the United States

4 Significantly, 19 U.S C § 1508 states: Record Keeping, any owner, importer, importer of

5 record, entry filer, or any party who imports merchandise into the Customs Territory of the

6 United States shall make, keep, and render for examination records which pertain to any such

7 activity and are normally kept in the ordinary course of business   There is reason to believe

8 that P W.Arms uses a computer to conduct its business.

9      41    In 1998, ATF Group Supervisor Doug Krogh entered the business premises of

10 P.W. Arms, at which time he noticed a computer being utilized.

11      42.    During his January 14, 2003, deposition, Prineas stated that he used e-mail to

12 contact Salinero concerning details of their business deal concerning the sale of the FN FAL

13 parts kits.

14      43    The internet web page located at http:\www barnaulammunition com lists P W.

15 Arms as the exclusive importer for Russian-made Barnaul ammunition   The web page also

16 has a link for a map with driving directions to P.W Arms   The web page has a listing

17 indicating that general information about Barnaul ammunition can be obtained by contacting

18 pwarms@barnaulammunition com and that information about sales of Barnaul ammunition

19 can be obtained by contacting sales@dansammo com.

20      44    Based on the foregoing, I submit that probable cause exists to believe that P.W.

21 Arms uses computers and electronic storage media during the normal course of business

22 operations and that the computers and electronic storage media located at the offices of P.W.

23 Arms are instrumentalities of violations listed above and contain evidence in an electronic

24 format.

25 **COMPUTER EVIDENCE**

26      45.    The computers to be search are storage devices for evidence of the violations

27 listed above.  Although ordinarily there would be no need to seize more storage devices for

28 evidence (as opposed to evidence itself), extracting information from computers requires

1 | agents to seize most or all electronic storage devices, along with related peripherals, to be
2 | search later by a qualified computer expert in a laboratory or other controlled environment.
3 | This is true because of the following:

4 |     46.    The volume of evidence.  Computer storage devices (such as hard disks,
5 | diskettes, tapes, laser disks, Bernoulli boxes and Zip drives (and/or other similar devices) can
6 | store the equivalent of hundreds or thousands of pages of information  Additionally, as a
7 | suspect may try to conceal criminal evidence, he or she might store it in random order with
8 | deceptive file names. This may require searching authorities to examine all the stored data to
9 | determine which particular files are evidence or instrumentalities of the crimes  This sorting
10 | process can take weeks or months, depending upon the volume of data stored, and it would
11 | be impractical to attempt this kind of data search on site

12 |     47    Technical requirements. Searching computer systems for criminal evidence is
13 | frequently a highly technical process requiring expert skill and a properly controlled
14 | environment.  The vast array of computer hardware and software available requires even
15 | computer experts to specialize in some systems and applications, so it is difficult to know
16 | before a search which expert is qualified to analyze the system and its data.  In any event,
17 | data search protocols are exacting scientific procedures designed to protect the integrity of the
18 | evidence and to recover even 'hidden,' erased, compressed, password protected, or encrypted
19 | files  Since computer evidence is extremely vulnerable to inadvertent or intentional
20 | modification or destruction (both from external sources or from destructive code embedded in
21 | the system as a 'booby trap'), a controlled environment is essential to its complete and
22 | accurate analysis

23 |     48.    The compatibility of peripheral devices and software.  The peripheral devices,
24 | which allow users to enter or retrieve data from the storage devices, vary widely in their
25 | compatibility with other hardware and software  Many system storage devices require
26 | particular input/output devices in order to read the data on the system.  It is important that the
27 | analyst be able to properly reconfigure the system as it now operates in order to accurately
28 | retrieve the evidence listed above

AFFIDAVIT OF MICHAEL B  STEWART - 11

**INSTRUMENTALITIES AND EVIDENCE OF CRIME**

1

2 49 Based on the facts contained in this Affidavit and Application, there is probable
3 cause to believe the computers and electronic storage devices located at P.W Arms have
4 been used to commit the violations listed above Therefore, the computer hardware, software,
5 computer documentation, passwords, and data security devices constitute the means of
6 committing criminal offenses Additionally, there is probable cause to believe that computers
7 and related electronic storage devices have been used to collect, store, maintain, retrieve,
8 conceal, transmit, and use electronic data related to the above listed violations in the form of
9 electronic records, documents, and materials, including those used to facilitate
10 communications, each of which constitutes both the means of committing the offenses and
11 evidence of the offenses These materials are all therefore subject to seizure and search
12 pursuant to Rule 41 of the Federal Rules of Criminal Procedure, and may be retained as
13 evidence and as instrumentalities used in the commission of a crime for a reasonable period of
14 time and may be examined, analyzed, and tested.

15 **SEIZURE OF EQUIPMENT AND DATA**

16 50. Based on my knowledge and training, and discussions I have had with ATF
17 Special Agent/CIS, I know that in order to completely and accurately retrieve data maintained in
18 computer hardware or on computer software, to ensure accuracy and completeness of such
19 data, and to prevent the loss of the data, either from accidental or programmed destruction, it is
20 often necessary that some computer equipment, peripherals, related instructions in the form of
21 manuals and notes, as well as the software utilized to operate such a computer, be searched
22 and processed by a qualified computer specialist in a laboratory setting.

23 51 I recognize that P.W. Arms is a functioning company and that a seizure of its
24 computers and potential computer network may have the unintended and undesired effect of
25 limiting the company's ability to provide service to its legitimate customers who are not
26 engaged in the above listed violations In response to these concerns, ATF CIS personnel will
27 attempt to minimize the inconvenience to the legitimate customers by evaluating the state of
28 the computer network, desktop computers, and removable electronic media at P.W. Arms and

AFFIDAVIT OF MICHAEL B STEWART - 12

1  determine the most appropriate and expeditious method of seizing the electronic information
2  that will protect the integrity of the electronic information and limit disruption of the business
3  This may include temporary removal of items and peripheral devices containing electronic
4  evidence for the purpose of creating electronic "images" of information stored on those devices.
5  Imaging a computer permits the agents to obtain an exact copy of the computer's stored data
6  without actually seizing the computer hardware for an extended period of time   The computer
7  experts or other technical experts will then conduct a search for the appropriate files described
8  in this affidavit form the "image" copy at a later date

9      52      These images will be made to maintain a reliable evidentiary chain of custody for
10  the evidence and because, as provided for in the warrant as a convenience to P W. Arms, Inc ,
11  the examination of the information on site would disrupt the business for an extended period
12  Exacting scientific procedures are necessary to protect the integrity of the evidence and to
13  recover hidden, erased, compressed, password protected, or encrypted files   Computer
14  evidence is extremely vulnerable to tampering or destruction (both from external sources or
15  from destructive code imbedded in the system as a "booby trap"), therefore, use of a controlled
16  environment of a laboratory is essential to its complete and accurate analysis

17      53.     The review of electronically stored data may entail any or all of several different
18  techniques.  Such techniques may include, but are not limited to, using specialized electronic
19  tools to discover and possibly recover deleted data or deliberately hidden files, performing
20  electronic "key word" scan through all electronic storage areas for strings of characters related
21  to the subject matter of the investigation, surveying various file "directories" and the individual
22  files they contain to locate the more important evidence, and looking at the first few "pages" of
23  files to determine the relevance of their contents

24      54.     Because of the nature of electronically stored data and the potentially large
25  amount of the data at P W. Arms, it will be necessary to have ATF CIS personnel, other
26  technical personnel, ATF criminal investigators, and other ATF employees share this work in an
27  efficient manner   Generally speaking, the CIS agents and other technically proficient personnel
28  will make an initial review of the seized images to find the files which most likely are evidence

AFFIDAVIT OF MICHAEL B  STEWART - 13

1  of the above crimes and most likely to be useful in the ongoing investigation. Therefore, the
2  case agents will only need to work with those files in determining further steps in the
3  investigation and making recommendations relating to possible prosecution.

4      55      If imaging proves impractical, or even impossible for technical reasons, the
5  agents will seize those components of the computer system of P.W. Arms, that the computer
6  experts believe must be seized to permit agents to locate the pertinent evidence files at an off-
7  site location. The components and associated peripherals will be seized and remain in ATF
8  custody  This is particularly true of evidence which may be stored on floppy disks, magnetic
9  tapes, CD-ROMs, DVDs, or other external electronic media that cannot be readily imaged on
10 site and require specialized equipment  Often, external media must be removed from the
11 search site and copied in a laboratory environment.

12 **ANALYSIS OF ELECTRONIC DATA**

13     56.     The analysis of electronically stored
14 data, whether performed on-site or in a laboratory or other controlled environment, may entail
15 any or all of several different techniques. Such techniques may include, but shall not be limited
16 to, surveying various file "directories" and the individual files they contain (analogous to looking
17 at the outside of a file cabinet for the marking it contains and opening a drawer capable of
18 containing pertinent files in order to locate the evidence and instrumentalities at which the
19 warrant is aimed); "opening" or reading the first few "pages" of such files in order to determine
20 their precise contents; "scanning" storage areas to discover and possible recover recently
21 deleted data, scanning storage areas for deliberately hidden files; and performing electronic
22 "key word" searches through all electronic storage areas to determine whether occurrences of
23 language contained in such storage areas exist that are intimately related to the subject matter
24 of the investigation  The analysis may be conducted by ATF CIS personnel or other personnel
25 as I deem appropriate.

26 **CONCLUSION**

27     57.     Based on the information outlined above, I submit that there is probable cause to
28 believe that there is evidence of the aforementioned violations of United States Law listed

AFFIDAVIT OF MICHAEL B STEWART - 14

1   above present at the business location of P.W. Arms, Inc., 8525 and 8533 152nd Avenue N.E ,

2   Redmond, Washington  98052, in the form of IMBEL FN FAL type machinegun parts kits and

3   documentary evidence in whatever form of the importation, storage and distribution of those

4   parts kits (including documents relating to Case No. C02-1026L)

5

6                                       MICHAEL B. STEWART, Complainant

7                                         Special Agent

8                                         Bureau of Alcohol, Tobacco, Firearms and Explosives

9             Affidavit sworn to before me and subscribed in my presence,

            this ___13___ day of June, 2003

10

11

12                                     MARY ALICE THEILER

13                                     United States Magistrate Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AFFIDAVIT OF MICHAEL B STEWART - 15

## ATTACHMENT A

### PHYSICAL ADDRESS/DESCRIPTION OF PREMISES

1.     8525 152nd Street, Redmond, Washington, is a multi-business building with metal siding that is tan in color with approximately the last three feet from the top being an off- white color.  There is a black awning with large white letters approximately ten inches in height that spell J E  WORK, INC., located above a black walk-in door   The black walk-in door with white numbers 8525 on it.  There is a window to the left of the black walk-in door and there is a small dark in color with white lettering sign that says J.E. Work, Inc , in the top right corner of the window Located in the lower left corner of the window is a small white sign with red lettering that says "Don't even think of parking here "  To the left of the black walk-in door is a large overhead garage door that is off- white in color and it is the second garage door in from the north.  To the left of the garage door is a green garbage dumpster.

2     8533 152nd Street, Redmond, Washington, is a multi-business, metal sided building, that is tan in color with a metal/silver overhead garage door that is the second door in from the west side of the building.  Located to the left of the garage door is a black walk-in door with white numbers **8533** on it.  To the left of the black walk-in door, there is a window with white trim.  Above the window and walk-in door is a black awning with nothing written on it.

## ATTACHMENT B

### SPECIFIC ITEMS TO BE SEARCHED FOR AND SEIZED

Items to be searched for and seized pursuant to the execution of this search warrant include.

IMBEL FN FAL type machinegun parts kits and documentary evidence in whatever form of the importation, storage and distribution of those parts kits from Patricio Salinero Arriogornaga (including documents relating to Case No  C02-1026L)

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF WASHINGTON

FILED
LODGED
ENTERED
RECEIVED

JUN 1 3 2003

AT SEATTLE
CLERK U S DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                          DEPUTY

In the Matter of the Search of
The business of
PW Arms, Inc located at
8533 152nd Street,
Redmond, Washington

## APPLICATION AND AFFIDAVIT
## FOR SEARCH WARRANT

CASE NUMBER:  03-336 M ②

I, <u>MICHAEL B. STEWART</u> being duly sworn depose and say

I am a <u>Special Agent, ATF</u> and have reason to believe that ___ on the person of or <u>XX</u> on the premises known as (name, description and/or address)

8533 152nd Street, Redmond, Washington, is a multi-business, metal sided building, that is tan in color with a metal/silver overhead garage door that is the second door in from the west side of the building.  Located to the left of the garage door is a black walk-in door with white numbers 8533 on it  To the left of the black walk-in door, there is a window with white trim  Above the window and walk-in door is a black awning with nothing written on it

in the ___<u>Western</u>___ District of ___<u>Washington</u>___ there is now concealed a certain person or property, namely (describe person/property)

IMBEL FN FAL type machinegun parts kits and documentary evidence of the importation, storage and distribution of those parts kits (including documents relating to Case No. C02-1026L).

which is (give alleged grounds for search under Rule 41(b) Fed R Crim P )

Evidence of the crimes of illegal smuggling, importation and possession of machineguns

in violation of Title ___18___ United States Code, Sections <u>542, 545, 922(e), 922(o)(1)</u> and Title <u>26</u> United States Code, Section <u>5861(d)</u>
The facts to support the issuance of a Search Warrant are as follows

See attached Affidavit of Special Agent MICHAEL B  STEWART, attached hereto and incorporated herein.

Continued on the attached sheet and made a part hereof  <u>XX</u> Yes ___ No

_____
MICHAEL B  STEWART, Special Agent
Signature of Affiant

Sworn to before me, and subscribed in my presence

<u>June 13, 2003</u>_____ at
Date and Time Issued

<u>Seattle,  Washington</u>_____
City and State

_____

<u>MARY ALICE THEILER, U S  Magistrate Judge</u>
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

1          A F F I D A V I T

2   STATE OF WASHINGTON          )
                                 )          ss
3   COUNTY OF KING               )

4

5          I, Michael B. Stewart, being duly sworn, do hereby depose and state:

6   **BACKGROUND**

7          1.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and

8   Explosives, United States Department of Justice (ATF), and have been so employed by ATF

9   and its predecessor agency since July 30, 1989  I am a graduate of Washington State

10  University.  I am also a graduate of the Federal Law Enforcement Training Center's Criminal

11  Investigation School and ATF's New Agent Training program.  The following is based on my

12  personal observations and upon information provided to me by other law enforcement agents.

13  This affidavit is submitted in support a warrant to search the premises of P.W  Arms, Inc.

14  (P.W  Arms), 8525 152nd Street, Redmond, Washington  98052, as well as associated storage

15  facilities located at 8533 152nd Street, Redmond, Washington  98052, further described in

16  Attachment A, for evidence of violations of Federal firearms laws.

17         2.      In summary, an investigation has revealed that P.W. Arms has illegally imported

18  and distributed machineguns as defined in Federal law.  Specifically, P.W. Arms, imported

19  what it purported to be 16,000 deactivated machineguns, which were in fact, not deactivated in

20  a manner that removed them from the definition of "machinegun," in that they could be readily

21  restored to shoot automatically more than one shot, without manual reloading, by a single

22  function of the trigger.  Evidence of that crime is believed to be at the business and storage

23  premises of P.W. Arms.  Said evidence includes almost 6,000 machineguns and business

24  records and other records, further described in Attachment B, relating to the importation,

25  storage and distribution of these items.

26  **RELEVANT LAW**

27         3       26 U.S.C  § 5845(b) defines the term "machinegun" to mean "any weapon which
                   shoots, is designed to shoot, or can be readily restored to shoot, automatically
28                 more than one shot, without manual reloading, by a single function of the trigger.
                   The term shall also include the frame or receiver of any such weapon, any part

AFFIDAVIT OF MICHAEL B  STEWART - 1

designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."

4       18 U.S.C. § 922(l), 18 U.S.C. § 925(d), and 26 U.S.C. § 5844 generally prohibit the importation of machineguns into the United States. It is not illegal to import a machinegun that has been deactivated or destroyed in such a manner that it no longer has the design characteristics of a machinegun or cannot be readily restored to shoot.

5.      18 U.S.C. §§ 542 and 545 make it unlawful to import goods into the United States by fraud or false statements, or to import any merchandise contrary to law

6.      18 U.S.C. § 922(o)(1) and 26 U.S.C. § 5861(d) generally make it unlawful for any person to transfer or possess a machinegun.

## STATEMENT OF FACTS

A. IMPORTATION OF IMBEL FN FAL TYPE PARTS KITS BY P.W. ARMS

7.      According to Stacy N. Prineas, President of P W. Arms, a Federal firearms licensee located at 8525 152nd Street, Redmond, Washington, he entered into negotiations with Patricio Salinero Arrigornaga (Salinero), a Chilean arms broker, in early 2000 to buy a quantity of "parts kits" to be assembled from destroyed Brazilian-made IMBEL FN FAL type machineguns

8.      In an ATF Form 6, Application and Permit for Importation of Firearms, Ammunition and Implements of War (hereinafter ATF Form 6) dated May 8, 2000, acting on behalf of P W. Arms, Daniel Tobin, 400 5th Street, New Kensington, Pennsylvania  15068, a Federal firearms licensee operating as "Dan's Sporting Goods, Inc ," sought to import, among other things 25,000 "FAL rifle parts kits." ATF approved said permit on May 15, 2000, and assigned it permit number 00-05532.  The permit indicated that the parts kits were being sold, and were to be shipped, by Salinero.  Said permit remained valid for a period of one year.

9       Prineas has confirmed that he sent Tobin, acting on behalf of P.W Arms, to Chile in July 2000, to inspect the FAL rifles that Salinero was offering for sale.

10      I have examined a copy of a contract Tobin signed on behalf of PW Arms, on July 7, 2000, in the name of Dan's Sporting Goods, Inc , whereby Salinero agreed to deliver 24,582 IMBEL FN FAL type parts kits at a cost of $84 each.  The contract specified that the

1  Form 6 obtained by Dan's Sporting Goods would be used to effect the importation of the parts

2  kits   The contract included a handwritten diagram depicting a receiver of an FN FAL type

3  machinegun. Included on this diagram are handwritten cutting instructions, approved by

4  Tobin, calling for the receiver of the firearm to be cut into three pieces. The instructions on

5  this diagram specify that the "mid portion to be kept intact with locking shoulder, ejector block

6  and other parts." This diagram has been examined by Curtis H A Bartlett, an ATF firearms

7  technology expert. Bartlett reports that an FN FAL machinegun cut in the manner depicted in

8  the drawing would not deactivate the firearm in a manner that it could be lawfully imported into

9  the United States. The contract specified that the parts kits were to be forwarded in three

10  shipments.

11       11     Later on July 7, 2000, on behalf of P.W Arms, Prineas signed an almost

12  identical contract with Salinero. The contract substituted Prineas for Tobin and the name PW

13  Arms for Dan's Sporting Goods, Inc. According to Prineas, the purpose of this contract was to

14  clarify that the contract was between Salinero and P.W. Arms, and not Dan's Sporting Goods.

15       12.     On May 18, 2001, prompted by a contract dispute, Salinero filed suit against

16  P.W. Arms and Dan's Sporting Goods in the United States District Court for the Western

17  District of Pennsylvania. That case was eventually transferred to the United States District

18  Court for the Western District of Washington and captioned <u>Patricio Salinero Arrigorriaga v</u>

19  <u>P W. Arm's Inc ; Dan's Sporting Goods</u>, Case No. C02-1026L   The lawsuit eventually settled

20  and an Order of Dismissal was entered on May 15, 2003.

21       13     In an Answer dated July 12, 2002 (filed July 15, 2002) to Paragraph 14 of the

22  Complaint filed in Case No  C02-1026L, P W. Arms and Dan's Sporting Goods, Inc., admitted

23  that "they had approved the method of deactivating [the FAL type machinegun parts kits]

24  receivers.

25       14.     In a deposition taken on January 14, 2003, Prineas stated that the first shipment

26  of approximately 6,000 FAL type parts kits arrived in Houston, Texas, in August 2000

27

28

1    15.    In a Declaration dated March 4, 2003, Prineas stated that this shipment of 6,000

2  FAL type parts kits was not released from Customs until September 2000. Prineas further

3  stated that it was the intention of P.W. Arms to have Larry Horner, a gunsmith in Texas,

4  assemble IMBEL FN FAL rifles using the parts kits and imported receivers

5    16.    Prineas further testified in his January 14, 2003, deposition that a second

6  shipment of approximately 10,000 IMBEL FN FAL type parts kits arrived in Seattle,

7  Washington, and was released from U.S. Customs to P.W Arms on or about November 2,

8  2000.

9    17    Following receipt of those shipments, P.W. Arms and Salinero had a falling out

10  over the quality and method of shipment of the firearms. As a result, P W Arms refused to

11  accept shipment of the remaining 8,579 firearms This dispute was the basis for the Complaint

12  filed in Case No. C02-1026L

13    18.    Prineas testified in his January 14, 2003, deposition that P.W. Arms was still in

14  possession of between 10,000 and 12,000 of the FN FAL parts kits; that roughly 8,800 of the

15  parts kits were being stored in a warehouse in Redmond, Washington, and that the remaining

16  kits were being stored in a warehouse in Apollo, Pennsylvania.

17    19    During the January 30, 2003, deposition of Doug Work, Vice President of PW

18  Arms, counsel for P.W. Arms presented a written summary/spread sheet by P.W. Arms of its

19  rifles and parts kits sales, drawn from invoices, that indicates that as of January 27, 2003,

20  P W. Arms had a total inventory of 11,171 FN FAL type parts kits, of which 8,415 were in

21  inventory in Redmond, Washington, while 2,756 were in inventory in Apollo, Pennsylvania.

22  The spread sheet also indicates that P W. Arms sold/ delivered 2,288 FN FAL parts kits to

23  Dan's Sporting Goods, Inc., between February 20, 2001, and November 15, 2002.

24    20.    Dick Van Loan, Director, Industry Operations (hereinafter "DIO"), Seattle Field

25  Division, ATF, has informed me that during a telephone conversation with Doug Work, Vice

26  President of P.W Arms, on May 30, 2003, Work stated that P W Arms contracted to

27  purchase approximately 24,000 IMBEL FN FAL type machinegun parts kits from a Chilean

28  company   Work further stated that after taking possession of 16,000 of these kits, a dispute

AFFIDAVIT OF MICHAEL B STEWART - 4

1 arose regarding the remaining 8,000 kits and according to Work, Interordnance of America,
2 L P., entered into a contract to purchase the rest of the lot.

3    21.    During that same conversation, Work told Van Loan that in February 2003, he
4 had shown a sample of an FN FAL parts kit to an ATF official (believed to be Curtis H.A.
5 Bartlett, ATF's then Chief of the Firearms Technology Branch), at the Shot (Shooting Hunting
6 Outdoors Trade) Show in Orlando, Florida, and that the ATF representative indicated that the
7 parts kits were legal. Work claimed that what he showed ATF at the Shot Show is exactly
8 what PW Arms is selling.

9    22.    On June 12, 2003, I monitored a telephone conversation between Work and ATF
10 Group Supervisor Doug Krogh. Work stated that P.W .Arms originally possessed 16,000
11 IMBEL FN FAL type machinegun parts kits, but had only 6,000 presently in its possession.
12 Work further stated that P.W .Arms has possessed the kits since sometime in 2000. Work
13 acknowledged the problems that Interordnance of America was having concerning IMBEL FN
14 FAL parts kit and stated that "all the kits here are from the same batch" as the unlawfully
15 imported kits seized from Interordnance. Work told Agent Krogh that the parts kits possessed
16 by P.W. Arms had been cut into three pieces and that one piece had been left behind in Chile.
17 Work told Agent Krogh that P.W.Arms did not want any trouble and would agree to an
18 inspection of the kits by ATF   Work said "if you have any concerns, come out and take a look
19 at them." Work added that PW Arms settled its lawsuit with Salinero and that he had a
20 deadline of June 20, 2003, to transfer the remaining parts kits back to Salinero   Work
21 indicated that he believed Salinero successfully sold the remaining parts kits to an unidentified
22 customer within the United States. When asked where the parts kits were currently located,
23 Work stated that they were being stored in a warehouse located at 8533 152nd Street,
24 Redmond, Washington.

25    23.    Simultaneously to this telephone contact, ATF was conducting surveillance at
26 P.W. Arms. One of the agents conducting surveillance advised me that he observed a large
27 number of wooden crates having steel bands and numbers on them, within the warehouse
28 located at 8533 152nd Street, Redmond, Washington.

AFFIDAVIT OF MICHAEL B STEWART - 5

1 | B  ATF/CUSTOMS INVESTIGATION OF INTERORDNANCE OF AMERICA

2  24  On December 4-5, 2001, a Federal search warrant was executed at the business
3 premises of Interordnance of America, L.P., located in Monroe, North Carolina.  Pursuant to
4 the search warrant, a number of items, including 2,637 IMBEL FN FAL type parts kits that
5 were purchased by Interordnance from Salinero  A sample of one of the seized IMBEL FN
6 FAL parts kits was submitted to ATF's Firearms Technology Branch in Washington, D.C., for
7 technical examination and classification.

8  25.  According to ATF Firearms Enforcement Officer Al Houde, who examined that
9 sample taken from Interordnance, the firearm was originally designed and manufactured as a
10 shoulder fire, closed bolt, magazine fed, gas operated, selective fire machinegun.  Houde
11 concluded that the aforementioned sample is a "machinegun" as defined in 26 U.S.C.
12 § 5845(b).  In other words, the way in which the machinegun was cut did not deactivate it in a
13 manner that would no longer be considered a machinegun under Federal law.

14  26.  Subsequent physical examination of the entire IMBEL FN FAL shipment to
15 Interordnance revealed that all of the machineguns were cut in the same manner.  Curtis H A.
16 Bartlett, an ATF Firearms Technology expert, has determined that these machineguns are cut
17 in the manner depicted on the schematic included in the contract that Prineas entered into with
18 Salinero.

19

20 | C  CONTACTS WITH OTHER FEDERAL FIREARMS LICENSEES

21  27.  On or about May 22, 2003, ATF Special Agent Ricky A. Hankins and ATF Group
22 Supervisor Terry L. Hicks, of ATF's St Paul, Minnesota, Field Office, while working on an
23 unrelated investigation, contacted The Sportsman's Guide, Inc. (hereinafter "Sportsman's
24 Guide"), South St Paul, Minnesota.  At that time, Thomas Glowaski, Assistant Treasurer of
25 Sportsman's Guide, revealed that his company had recently received 45 FN FAL parts kits
26 from PW Arms  Due to Group Supervisor Hicks' observation that the kits that Sportsman's
27 Guide received from PW Arms apparently were cut in the same manner as those ATF seized

28

1 from Interordnance, Group Supervisor Hicks caused a digital photograph of one of the FN FAL
2 parts kits to be taken and sent to ATF's Firearms Technology Branch.

3     28.    On May 29, 2003, Agent Hankins and Group Supervisor Hicks met with Greg
4 Gerling, a purchasing agent for Sportsman's Guide   Gerling said that in February 2003, he
5 was approached by Prineas at the Shot Show in Orlando, Florida.  Gerling stated that at the
6 time, Prineas solicited him to purchase firearm parts kits from PW Arms and touted P W. Arms
7 as having the only "totally legal" FN FAL parts kits available in the United States

8     29.    Gerling provided the agents with an invoice dated May 1, 2003, from P.W. Arms
9 (Invoice No  PW-6001-23) for the sale of 45 "IMBEL FAL part kits" to Sportsman's Guide at a
10 unit price of $125 each.  Gerling informed Agent Hicks that the shipment of parts kits arrived
11 on May 15, 2003   At the conclusion of the interview, Agent Hicks seized one of the IMBEL FN
12 FAL parts kits and forwarded it to ATF's Firearms Technology Branch for a technical
13 examination.

14     30    That kit was received by ATF's Firearms Technology Branch on June 2, 2003.
15 Firearms Enforcement Officer Houde confirmed that this FN FAL parts kit, which Sportsman's
16 Guide obtained from P.W  Arms, was cut in an identical manner to the FN FAL parts kits
17 seized from Interordnance in December 2001, that ATF classified as a "machinegun."  On
18 June 2, 2003, Curtis H A  Bartlett stated that he examined the above-referenced FN FAL parts
19 kit seized from Sportsman's Guide and that it differed from the sample Work showed him at
20 the February 2003 Shot Show in that the FN FAL parts kits from P.W. Arms shown to him in
21 Florida had only the front portion of the cut receiver, which was attached at the barrel.  By
22 contrast, the FN FAL parts kits sample seized from Sportsman's Guide included the front and
23 middle portions of the receiver and was determined to be cut in the same manner as the
24 unlawfully imported FN FAL parts kits seized from Interordnance   Thus, it is fair to infer that
25 the remaining kits at P W. Arms are also machineguns imported and possessed unlawfully

26     31.    Rod McKay, Federal Arms Corporation, Fridley, Minnesota, has told ATF that in
27 April 2003, Prineas contacted him and offered to sell him 6,000 FN FAL type machinegun
28

1 parts kits  McKay declined the offer when Prineas refused to provide adequate assurances
2 that the kits were legal.  Prineas' refusal suggests that he knows the pars kits are illegal

3      32      On June 4, 2003, ATF Special Agents John Schroepfer and Nathaniel Jones
4 interviewed Scott Corrigan, Import Manager, Century International Arms Corporation
5 (hereinafter "Century Arms"), 236 Bryce Boulevard, Fairfax, Vermont.  Corrigan said that on or
6 about May 15, 2003, he was told by Brian Sucher, CEO of Century Arms, that Prineas had
7 contacted Century Arms headquarters, 1161 Holland Drive, Boca Raton, Florida, and stated
8 that he had 6,000 IMBEL FAL "parts kits" from Chile for sale.  On May 16, 2003, Century Arms
9 faxed a letter to Prineas asking for an offer on the kits as well as confirmation that the kits
10 were complete.  Prineas followed up this conversation with a letter to Century Arms dated May
11 17, 2003, offering to sell IMBEL FAL parts kits.  On May 24, 2003, Prineas offered to sell the
12 parts kits at a cost of $125 each.  Corrigan told Agents Schroepfer and Jones that he
13 personally believed that the items Prineas was attempting to sell were unlawfully imported and
14 that Century ultimately decided not to consummate the transaction

15      33.      Corrigan added that on November 23, 2001, Century Arms purchased 4,563
16 IMBEL FN FAL machinegun parts kits from Salinero.  Corrigan stated that prior to importing
17 these items, Century Arms recognized the items as machineguns.  It then legally imported
18 them as such, and completed the deactivation process under U.S. Customs Service
19 supervision.  Corrigan stated that these machinegun parts kits were only a portion of a larger
20 lot that Salinero had offered for sale and that Corrigan was aware that three other companies
21 in the United States were involved in purchasing other parts kits from this lot.  Corrigan
22 identified the other parties as P.W. Arms, Dan's Sporting Goods, and Interordnance.

23      34.      Significantly, Corrigan further informed Agents Schroepfer and Jones that on or
24 about August 2002, he caused a Century Arms employee to order an IMBEL FAL parts kit
25 from Dan's Sporting Goods.  Corrigan stated that his reason for having the purchase made
26 was to determine whether Century Arms would be interested in making a bulk purchase order
27 from Dan's Sporting Goods since, according to Corrigan, Century Arms was beginning to run
28 short on FN FAL parts.

AFFIDAVIT OF MICHAEL B  STEWART - 8

1    35.    Corrigan told Agents Schroepfer and Jones that he conducted an inspection of
2    the IMBEL FAL parts kit when it arrived from Dan's Sporting Goods  Corrigan said that he
3    immediately recognized that the parts kit was a "machinegun" because in his opinion, the
4    firearm had not been properly deactivated.  Corrigan further stated that after examining the
5    parts kit purchased from Dan's Sporting Goods, he realized that the parts kit had been cut in
6    the same locations and manner as the ones that Century Arms purchased from Salinero in
7    November 2001.

8    36.    Corrigan added that because of his suspicion that the parts kit obtained from
9    Dan's Sporting Goods was actually a "machinegun," he forwarded the parts kit to ATF's
10   Firearms Technology Branch for a technical examination.  In a letter to Corrigan, the Firearms
11   Technology Branch determined that the parts kit was, in fact, a machinegun.  ATF's Firearms
12   Technology Branch advises that the parts kit submitted by Corrigan was cut in the same
13   manner as the schematic attached to the contract P.W. Arms entered into with Salinero, again
14   supporting the inference that the parts kits at P.W. Arms are illegal

15   D. ADDITIONAL INFORMATION

16   37.    P.W. Arms, as a Federal firearms licensee operating under license number 9-91-
17   033-08-3G-38718, is required to keep and maintain records on its business premises relating
18   to the acquisition and disposition of firearms.  See 18 U.S.C. § 923(g) and 27 C.F.R. §
19   478 121 (formerly 27 C.F R. § 178.121).

20   38.    27 C.F.R § 447.34 (b) (formerly 27 C.F.R. § 47.34(b)) states that registrants
21   under this part engaged in importing articles on the U.S. Munitions List subject to the permit
22   procedures of subpart E of this part shall maintain for a period of six years, subject to
23   inspection by any ATF Officer, records bearing on such articles imported, including records
24   concerning their acquisition and disposition by the registrant.

25   39.    A query of the ATF Federal Firearms Licensee Database reflects the listed
26   address for P.W. Arms to be 8525 152nd Avenue, Redmond, Washington  98052. ATF's
27   records show that PW Arms has held a Federal firearms license since at least June 1997 and
28   has been at its current location since that time.

AFFIDAVIT OF MICHAEL B  STEWART - 9

1   40.   P.W Arms, as an importer of record with the United States Customs Service

2   operating under consignee number 91-177108500, is required to keep and maintain required

3   records relating to the importation of merchandise into the commerce of the United States.

4   Significantly, 19 U.S.C § 1508 states: Record Keeping, any owner, importer, importer of

5   record, entry filer, or any party who imports merchandise into the Customs Territory of the

6   United States shall make, keep, and render for examination records which pertain to any such

7   activity and are normally kept in the ordinary course of business   There is reason to believe

8   that P.W Arms uses a computer to conduct its business.

9   41.   In 1998, ATF Group Supervisor Doug Krogh entered the business premises of

10   P W. Arms, at which time he noticed a computer being utilized.

11   42   During his January 14, 2003, deposition, Prineas stated that he used e-mail to

12   contact Salinero concerning details of their business deal concerning the sale of the FN FAL

13   parts kits.

14   43.   The internet web page located at http:\www.barnaulammunition.com lists P.W.

15   Arms as the exclusive importer for Russian-made Barnaul ammunition   The web page also

16   has a link for a map with driving directions to P.W. Arms   The web page has a listing

17   indicating that general information about Barnaul ammunition can be obtained by contacting

18   pwarms@barnaulammunition com and that information about sales of Barnaul ammunition

19   can be obtained by contacting sales@dansammo com.

20   44.   Based on the foregoing, I submit that probable cause exists to believe that P W.

21   Arms uses computers and electronic storage media during the normal course of business

22   operations and that the computers and electronic storage media located at the offices of P.W.

23   Arms are instrumentalities of violations listed above and contain evidence in an electronic

24   format.

25   **COMPUTER EVIDENCE**

26   45.   The computers to be search are storage devices for evidence of the violations

27   listed above.  Although ordinarily there would be no need to seize more storage devices for

28   evidence (as opposed to evidence itself), extracting information from computers requires

AFFIDAVIT OF MICHAEL B STEWART - 10

1  agents to seize most or all electronic storage devices, along with related peripherals, to be
2  search later by a qualified computer expert in a laboratory or other controlled environment.
3  This is true because of the following:

4      46.     The volume of evidence.  Computer storage devices (such as hard disks,
5  diskettes, tapes, laser disks, Bernoulli boxes and Zip drives (and/or other similar devices) can
6  store the equivalent of hundreds or thousands of pages of information.  Additionally, as a
7  suspect may try to conceal criminal evidence, he or she might store it in random order with
8  deceptive file names.  This may require searching authorities to examine all the stored data to
9  determine which particular files are evidence or instrumentalities of the crimes.  This sorting
10  process can take weeks or months, depending upon the volume of data stored, and it would
11  be impractical to attempt this kind of data search on site

12      47     Technical requirements.  Searching computer systems for criminal evidence is
13  frequently a highly technical process requiring expert skill and a properly controlled
14  environment.  The vast array of computer hardware and software available requires even
15  computer experts to specialize in some systems and applications, so it is difficult to know
16  before a search which expert is qualified to analyze the system and its data   In any event,
17  data search protocols are exacting scientific procedures designed to protect the integrity of the
18  evidence and to recover even 'hidden,' erased, compressed, password protected, or encrypted
19  files   Since computer evidence is extremely vulnerable to inadvertent or intentional
20  modification or destruction (both from external sources or from destructive code embedded in
21  the system as a 'booby trap'), a controlled environment is essential to its complete and
22  accurate analysis.

23      48.     The compatibility of peripheral devices and software.  The peripheral devices,
24  which allow users to enter or retrieve data from the storage devices, vary widely in their
25  compatibility with other hardware and software.  Many system storage devices require
26  particular input/output devices in order to read the data on the system   It is important that the
27  analyst be able to properly reconfigure the system as it now operates in order to accurately
28  retrieve the evidence listed above.

AFFIDAVIT OF MICHAEL B STEWART - 11

1  **INSTRUMENTALITIES AND EVIDENCE OF CRIME**

2       49    Based on the facts contained in this Affidavit and Application, there is probable
3  cause to believe the computers and electronic storage devices located at P.W. Arms have
4  been used to commit the violations listed above.  Therefore, the computer hardware, software,
5  computer documentation, passwords, and data security devices constitute the means of
6  committing criminal offenses.  Additionally, there is probable cause to believe that computers
7  and related electronic storage devices have been used to collect, store, maintain, retrieve,
8  conceal, transmit, and use electronic data related to the above listed violations in the form of
9  electronic records, documents, and materials, including those used to facilitate
10 communications, each of which constitutes both the means of committing the offenses and
11 evidence of the offenses.  These materials are all therefore subject to seizure and search
12 pursuant to Rule 41 of the Federal Rules of Criminal Procedure, and may be retained as
13 evidence and as instrumentalities used in the commission of a crime for a reasonable period of
14 time and may be examined, analyzed, and tested.

15 **SEIZURE OF EQUIPMENT AND DATA**

16      50.    Based on my knowledge and training, and discussions I have had with ATF
17 Special Agent/CIS, I know that in order to completely and accurately retrieve data maintained in
18 computer hardware or on computer software, to ensure accuracy and completeness of such
19 data, and to prevent the loss of the data, either from accidental or programmed destruction, it is
20 often necessary that some computer equipment, peripherals, related instructions in the form of
21 manuals and notes, as well as the software utilized to operate such a computer, be searched
22 and processed by a qualified computer specialist in a laboratory setting.

23      51.    I recognize that P.W Arms is a functioning company and that a seizure of its
24 computers and potential computer network may have the unintended and undesired effect of
25 limiting the company's ability to provide service to its legitimate customers who are not
26 engaged in the above listed violations   In response to these concerns, ATF CIS personnel will
27 attempt to minimize the inconvenience to the legitimate customers by evaluating the state of
28 the computer network, desktop computers, and removable electronic media at P.W. Arms and

AFFIDAVIT OF MICHAEL B STEWART - 12

1  determine the most appropriate and expeditious method of seizing the electronic information
2  that will protect the integrity of the electronic information and limit disruption of the business.
3  This may include temporary removal of items and peripheral devices containing electronic
4  evidence for the purpose of creating electronic "images" of information stored on those devices
5  Imaging a computer permits the agents to obtain an exact copy of the computer's stored data
6  without actually seizing the computer hardware for an extended period of time.  The computer
7  experts or other technical experts will then conduct a search for the appropriate files described
8  in this affidavit form the "image" copy at a later date

9       52.     These images will be made to maintain a reliable evidentiary chain of custody for
10  the evidence and because, as provided for in the warrant as a convenience to P.W. Arms, Inc.,
11  the examination of the information on site would disrupt the business for an extended period.
12  Exacting scientific procedures are necessary to protect the integrity of the evidence and to
13  recover hidden, erased, compressed, password protected, or encrypted files   Computer
14  evidence is extremely vulnerable to tampering or destruction (both from external sources or
15  from destructive code imbedded in the system as a "booby trap"), therefore, use of a controlled
16  environment of a laboratory is essential to its complete and accurate analysis.

17       53.     The review of electronically stored data may entail any or all of several different
18  techniques.  Such techniques may include, but are not limited to, using specialized electronic
19  tools to discover and possibly recover deleted data or deliberately hidden files; performing
20  electronic "key word" scan through all electronic storage areas for strings of characters related
21  to the subject matter of the investigation, surveying various file "directories" and the individual
22  files they contain to locate the more important evidence, and looking at the first few "pages" of
23  files to determine the relevance of their contents.

24       54.     Because of the nature of electronically stored data and the potentially large
25  amount of the data at P W. Arms, it will be necessary to have ATF CIS personnel, other
26  technical personnel, ATF criminal investigators, and other ATF employees share this work in an
27  efficient manner.  Generally speaking, the CIS agents and other technically proficient personnel
28  will make an initial review of the seized images to find the files which most likely are evidence

AFFIDAVIT OF MICHAEL B  STEWART - 13

1 of the above crimes and most likely to be useful in the ongoing investigation. Therefore, the
2 case agents will only need to work with those files in determining further steps in the
3 investigation and making recommendations relating to possible prosecution.

4       55.    If imaging proves impractical, or even impossible for technical reasons, the
5 agents will seize those components of the computer system of P.W. Arms, that the computer
6 experts believe must be seized to permit agents to locate the pertinent evidence files at an off-
7 site location  The components and associated peripherals will be seized and remain in ATF
8 custody  This is particularly true of evidence which may be stored on floppy disks, magnetic
9 tapes, CD-ROMs, DVDs, or other external electronic media that cannot be readily imaged on
10 site and require specialized equipment.  Often, external media must be removed from the
11 search site and copied in a laboratory environment

12 **ANALYSIS OF ELECTRONIC DATA**

13       56.    The analysis of electronically stored
14 data, whether performed on-site or in a laboratory or other controlled environment, may entail
15 any or all of several different techniques.  Such techniques may include, but shall not be limited
16 to, surveying various file "directories" and the individual files they contain (analogous to looking
17 at the outside of a file cabinet for the marking it contains and opening a drawer capable of
18 containing pertinent files in order to locate the evidence and instrumentalities at which the
19 warrant is aimed); "opening" or reading the first few "pages" of such files in order to determine
20 their precise contents; "scanning" storage areas to discover and possible recover recently
21 deleted data; scanning storage areas for deliberately hidden files; and performing electronic
22 "key word" searches through all electronic storage areas to determine whether occurrences of
23 language contained in such storage areas exist that are intimately related to the subject matter
24 of the investigation.  The analysis may be conducted by ATF CIS personnel or other personnel
25 as I deem appropriate.

26 **CONCLUSION**

27       57    Based on the information outlined above, I submit that there is probable cause to
28 believe that there is evidence of the aforementioned violations of United States Law listed

1  above present at the business location of P.W. Arms, Inc., 8525 and 8533 152nd Avenue N E.,

2  Redmond, Washington  98052, in the form of IMBEL FN FAL type machinegun parts kits and

3  documentary evidence in whatever form of the importation, storage and distribution of those

4  parts kits (including documents relating to Case No. C02-1026L).

5

6

7  MICHAEL B  STEWART, Complainant
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

8

9      Affidavit sworn to before me and subscribed in my presence,
this __13__ day of June, 2003.

10

11

12  MARY ALICE THEILER
United States Magistrate Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## ATTACHMENT A

## PHYSICAL ADDRESS/DESCRIPTION OF PREMISES

1     8525 152nd Street, Redmond, Washington, is a multi-business building with metal siding that is tan in color with approximately the last three feet from the top being an off- white color.  There is a black awning with large white letters approximately ten inches in height that spell J.E. WORK, INC., located above a black walk-in door.  The black walk-in door with white numbers 8525 on it.  There is a window to the left of the black walk-in door and there is a small dark in color with white lettering sign that says J E. Work, Inc., in the top right corner of the window. Located in the lower left corner of the window is a small white sign with red lettering that says "Don't even think of parking here."  To the left of the black walk-in door is a large overhead garage door that is off- white in color and it is the second garage door in from the north   To the left of the garage door is a green garbage dumpster.

2     8533 152nd Street, Redmond, Washington, is a multi-business, metal sided building, that is tan in color with a metal/silver overhead garage door that is the second door in from the west side of the building.  Located to the left of the garage door is a black walk-in door with white numbers **8533** on it.  To the left of the black walk-in door, there is a window with white trim.  Above the window and walk-in door is a black awning with nothing written on it.

## ATTACHMENT B

## SPECIFIC ITEMS TO BE SEARCHED FOR AND SEIZED

Items to be searched for and seized pursuant to the execution of this search warrant include:

IMBEL FN FAL type machinegun parts kits and documentary evidence in whatever form of the importation, storage and distribution of those parts kits from Patricio Salinero Arriogorriaga (including documents relating to Case No C02-1026L)